**STATE of Minnesota, Respondent,**

v.

**Sheldon Joseph SAILOR, Appellant.**

**No. 48679.**

Supreme Court of Minnesota.

Feb. 29, 1980.

---

C. Paul Jones, Public Defender, and Phebe S. Haugen, Special Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan L. Mitchell, County Atty., and Michael W. McNabb, Asst. County Atty., Duluth, for respondent.

PETERSON, Justice.

Defendant was found guilty by a district court jury of aggravated assault, Minn.Stat. § 609.225, subd. 2 (1976) (assault with a dangerous weapon), and was sentenced by the trial court to a term of 1 to 10 years in prison. On this appeal from judgment of conviction, defendant contends that (1) the evidence that he committed the assault was legally insufficient and that (2) he was prejudiced by the prosecutor's cross-examination of him about his pretrial silence concerning his alibi. We affirm.

The victim of the assault in this case was Leonard Welsh, a 53-year-old man. Defendant, a 27-year-old American Indian, was an acquaintance of Welsh who occasionally drank with him at bars in Duluth. The assault occurred when two men kicked and stabbed Welsh shortly after the bars closed on Wednesday, April 27, 1977. Welsh was found at 1:55 a. m., lying in a pool of blood in a parking lot near the bars he had patronized. Welsh, who appeared intoxicated, told one of the men who found him that "his friends did him in" and told police that the man who cut him was an Indian whom he knew but that he did not know his name. Police seized a pocketknife and a pack of unfiltered Camel cigarettes, both of which had been found near Welsh but were not his.

Welsh was taken by ambulance to a hospital, where he was operated on and was in intensive care for a number of days. In addition to receiving antibiotics intravenously, Welsh also received Demerol in a dose which was reduced as his condition improved. Welsh's Demerol intake is important because it was not until May 4 that Welsh identified defendant as his assailant; the state's explanation for this is that Welsh's memory returned as he was weaned from Demerol, one of the potential side effects of which apparently is temporary memory loss.

Welsh was first interviewed at the hospital a day or two after the incident by Sergeant James Bujole and Officer Donnetta Wickstrom. He was in great pain at the time, was having difficulty talking and breathing, and seemed to drift, but the officers testified they did get some information from him—e. g., that his assailants were white and that the man who stabbed him was in his late thirties and was wearing a denim jacket with the sleeves ripped off.

Sergeant Gary Waller questioned Welsh a number of times at the hospital, first on the evening of April 28. Welsh told him, as he had at the scene of the attack, that he thought both assailants were Indians, although the one who attacked him may have been white, and that the one who attacked him was 6 feet tall, well built, had longer hair, and was wearing a sleeveless denim jacket with an emblem on the back.

Waller testified that on May 2 Welsh repeated this and added that the man who had cut him had been sitting with Dan and Sandy LaFave at the Apollo Bar and that Ardis Sailor and her husband (defendant) were friends of the man and might know his name.

On May 3, Waller showed six photographs of Indian males to Welsh, including

one of defendant, and Welsh recognized defendant but did not think he was the assailant.

Also on May 3, Welsh received a phone call which was placed from a phone in the Kozy Bar by defendant, his wife Ardis, and a friend of Welsh, Leroy Gissendaner. Welsh testified that defendant did not identify himself but that he recognized defendant's voice and that defendant made a number of statements, including "Let bygones be bygones."

Welsh talked with Waller the next day and told him that his head was clearer, that the phone call had jarred his memory, and that he now knew it was defendant who had assaulted him.

Police arrested defendant on May 7. He was wearing a denim jacket with a flag emblem on the back and the sleeves cut off. Human bloodstains, which could not be typed successfully, were found on the jacket. Police also found a pack of filter-tip Camel cigarettes on defendant's person.

At trial, Welsh positively identified defendant as his assailant, saying defendant had accused him of fooling with his "old lady" (Ardis) while defendant was in jail. He testified defendant then produced a knife, chased him, caught him, kicked him, and stabbed him.

Defendant, whose credibility was impeached by cross-examination about some of his prior convictions, testified that he had been drinking heavily on the night in question and had gone to the residence of friends, where he had passed out and spent the rest of the evening, and that he was asleep at the time of the assault. He also denied saying anything like "Let bygones be bygones" when he called Welsh from the bar; rather, that the purpose of his call was to see if he could get anything for Welsh.

Defendant called a number of witnesses, including some who corroborated his testimony relating to what he did early on the evening of the 26th and some whose testimony was elicited as part of an attempt to discredit parts of Welsh's testimony about what he was doing on the evening in question. However, the testimony of only two of the witnesses, defendant's wife, Ardis, and a man named Mel Sims, spoke to the issue of where defendant was at the time of the assault. Significantly, the testimony of both of these witnesses was substantially impeached by the prosecutor.

■ 1. Defendant's first contention is that the evidence of his guilt was legally insufficient to sustain a verdict and that therefore his conviction must be reversed outright and a judgment of acquittal entered. While Welsh's delay in identifying defendant is troubling, we do not think that fact establishes that as a matter of law his in-court identification testimony was unbelievable, especially in view of the evidence that (a) when first questioned at the scene Welsh stated that the man who cut him was an Indian friend and (b) the evidence that the Demerol may have had a temporary negative effect on Welsh's memory. We also note that there was other evidence pointing to defendant's guilt, to wit: (a) evidence that defendant's jacket fit the description given by Welsh, (b) evidence that the jacket was bloodstained, (c) evidence that nonfiltered Camel cigarettes were found at the scene and that when arrested defendant had filtered Camel cigarettes on his person, and (d) corroborating evidence concerning the telephone call to Welsh by defendant and his wife from the Kozy Bar. In conclusion, we hold that the evidence of defendant's guilt was sufficient to support the verdict.

■ 2. Defendant's other issues relate to the prosecutor's cross-examination of defendant concerning his pretrial silence about his alibi. One of the issues raised is whether defense counsel, by failing to object, forfeited his right to have this court consider the issue or whether the error was plain error not requiring an objection. The other issue is whether, if the issue is considered, the cross-examination prejudiced defendant.

In this case it appears that the prosecutor, in cross-examining defendant about his pretrial silence concerning the alibi, was specifically relying on the first opinion of this court in *State v. Billups,* issued a couple

of weeks before the trial, where this court upheld this sort of cross-examination. Presumably defense counsel also was aware of the first *Billups* opinion and deliberately decided against objecting on that basis. Thus, even if the error might not be deemed to be plain error, it would seem that this court's first opinion in *Billups* was responsible for defense counsel's failure to object, and therefore defense counsel's failure to object should be excused on this ground.

The second opinion in *State v. Billups*, 264 N.W.2d 137 (Minn.1978), filed after rehearing and after the trial in this case, makes it clear that the prosecutor's cross-examination in this case was improper. In reversing, the court in *Billups* concluded that the error was not harmless beyond a reasonable doubt because "The error impaired defendant's alibi, and the prosecution's case was not overwhelming."

The state in this case, while conceding error, argues strongly that the error was not prejudicial, and we agree, for two reasons. First, notwithstanding the cross-examination, the jury eventually learned that defendant had discussed his alibi with the police when he was arrested and that the police had also learned about the alibi from defendant's wife. Specifically, on redirect examination defendant testified that he may have mentioned his alibi to the police, and defendant's memory was corroborated by Detective Richard Yagoda, who, testifying for the defense, stated that he briefly discussed defendant's alibi with him shortly after he was arrested. Also, Sergeant Waller testified about what he did to investigate defendant's alibi after he talked with defendant's wife. Second, we believe it is significant that the testimony of defendant's two key alibi witnesses was effectively impeached. Under these circumstances, we conclude that the interests of justice do not mandate a new trial.

Affirmed.